## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| NICOLE KEMPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **2:14-cv-00494-JDL** |
| | ) | |
| DELHAIZE AMERICA SHARED | ) | |
| SERVICES GROUP LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Nicole Kempton has sued her former employer, Delhaize America Shared Services Group LLC, and Hannaford Bros. Co. (collectively, "Hannaford"), alleging that it interfered with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2601 *et seq.* (2015). Kempton also alleges that Hannaford retaliated against her in violation of the FMLA and the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S.A. § 831 *et seq.* (2015). Hannaford has moved for summary judgment as to all claims. ECF No. 21. For the reasons set forth below, Hannaford's motion is granted.

### I. FACTUAL BACKGROUND

Nicole Kempton worked for Hannaford at the company's store in Winthrop, Maine, from 2009 to 2012 as an Assistant Customer Service Manager. ECF No. 22 at 1; ECF No. 28 at 1, ¶ 1. She had no disciplinary problems until 2012. ECF No. 28 at 14, ¶ 1, ¶ 1; ECF No. 32 at 1, ¶ 1. Kempton's immediate supervisor was the store's Customer Service Manager, Ron Douglas. ECF No. 22 at 1, ¶ 1; ECF No. 28 at 1, ¶

1.  Kempton's other supervisor was the store's Associate Relations Manager, John Wellwood.  Wellwood's assistant was Lisa Buzzell.

## A.    Relevant Hannaford Policies

It is undisputed that in 2012, when most of the events at issue in this case occurred, Hannaford had an employee discipline policy known as its "performance counseling" policy, ECF No. 22 at 6, ¶ 32; ECF No. 28 at 6, ¶ 32, and a separate, but related, attendance and punctuality policy, ECF No. 28-21; ECF No. 22 at 5, ¶ 27; ECF No. 28 at 4, ¶ 27.

The performance counseling policy consisted of four progressive steps: Step One consisted of verbal counseling, ECF No. 22 at 6, ¶ 32;  Step Two consisted of the employee's first written notice, *id*.; Step Three consisted of the employee's final written notice, *id*.; and Step Four consisted of the "[f]inal [d]isciplinary [a]ction (up to and including termination)."  *Id*.

The parties do not dispute that the attendance and punctuality policy forbids unauthorized absences, leaving a shift early, or taking breaks early or late.  ECF No. 22 at 5, ¶ 28; ECF No. 28 at 4-5, ¶ 28.  However, they do dispute whether coming to work before the beginning of a shift constitutes tardiness under the policy—Hannaford contends that such an occurrence would count as tardiness, while Kempton contends that the policy does not include coming to work early as an occurrence or tardiness and therefore does not support Hannaford's interpretation. *Id*.

**B.     Kempton's FMLA Request**

In 2011, Kempton's husband contracted Lyme Disease and suffered various complications as a result.  ECF No. 28 at 14, ¶¶ 2, 3.  Kempton was granted intermittent FMLA leave in December 2011 in order to care for him.  ECF No. 22 at 2, ¶ 5; ECF No. 28 at 1, ¶ 5.  Hannaford first sent her a preliminary approval letter dated December 2, 2011, which stated that her FMLA leave was to begin on November 6, 2011, and end on November 6, 2012.  ECF No. 22-2 at 1.  Hannaford subsequently sent Kempton a second approval letter, dated December 21, 2011, which stated that the company had received certain required medical documentation and that as a result, it was amending the approved period of intermittent FMLA leave to six months, from November 6, 2011 to May 1, 2012.  ECF No. 22-2 at 10.

In August 2012, Kempton received a third FMLA authorization letter from Hannaford.  ECF No. 22-5; ECF No. 22 at 4, ¶ 17; ECF No. 28 at 3, ¶ 17; ECF No. 28-23 at 4, ¶ 14.  However, this letter omitted the dates indicating when the period of leave would begin or end.  ECF No. 22-5.  Kempton asked Lisa Buzzell about the letter and was told that her FMLA leave for her husband was still in place and that no action was required.  ECF No. 28-23 at 4, ¶ 14.

Although Hannaford's December 21, 2011, approval letter stated only a six-month leave period, Kempton nevertheless utilized intermittent FMLA leave to care for her husband from December 2011 until shortly before her termination in November 2012, as evidenced by her deposition testimony, ECF No. 22-1 at 21, and multiple "call-in reports" which are written records dating from between May 2012 and October 2012 that reflect Kempton's absences from work, ECF No. 28-36 at 33;

3

ECF No. 28-37 through 28-44.  The call-in reports contain either a notation stating "FMLA" or reference Kempton's husband's illness as the reason for her absence.  *See id.*

On October 11, 2012, Kempton stopped by Buzzell's office to inform her that she would not be staying to work her shift that day and asked Buzzell to "get the papers for her to extend her FMLA."  ECF No. 36-34.  Buzzell refused, telling Kempton that she "could not do that for her[,]" and instead gave Kempton a card containing the telephone number for Hannaford's Associate Service Center, which Kempton could call directly in order to request the necessary documents.  *Id.*; ECF No. 28 at 29, ¶ 51; ECF No. 36-36 at 2-3.  On October 16, 2012, Buzzell informed Kempton that her FMLA leave had expired.  ECF No. 28-30; ECF No. 28-23 at 4, ¶ 15.

## C.    Kempton's Workplace Discipline

Kempton and Hannaford disagree about many of the pertinent facts surrounding the workplace discipline that Hannaford imposed upon her in 2012. Kempton alleges that in July 2012, she began receiving written discipline for utilizing FMLA time and for attendance issues that had never previously raised any concerns, such as arriving early for her shift and leaving early from her shift.[1]  ECF No. 27 at 4 (citing ECF No. 28 at 15-16, ¶¶ 6-11).  Hannaford asserts that the attendance and punctuality policy changed on February 5, 2012, in the midst of Kempton's FMLA leave, and that the reason for Kempton's employee discipline was the fact that she

---

[1] Hannaford's written records indicate that Kempton received her Step One verbal counseling on August 21, 2012 and her Step Two first written notice on September 3, 2012.  ECF No. 22-13 at 1.

was leaving her shift early, not that she was arriving early.  ECF No. 32 at 2-4, ¶¶ 7, 9.

Kempton also maintains that she was disciplined for infractions for which other employees were not disciplined.  ECF No. 27 at 5.  For example, Kempton maintains that other employees with similar attendance records received discipline after seven to twelve absences, whereas she was disciplined after only five absences. ECF No. 28 at 25, ¶ 41.  Hannaford states that simply counting absences per employee is not as straightforward as it seems because under its attendance policy, "a multi-day, consecutive absence is only counted as a single occurrence if the absence is for the same reason."  ECF No. 32 at 22-23, ¶ 41.  Hannaford also notes that at least one other employee received Step One counseling after five absences in a twelve-month period, and received Step Two counseling after six absences in a twelve-month period.  *Id.* (citing ECF No. 22-25 at 3).

Kempton also asserts that in late August 2012, Douglas met privately with her after she had requested an "accommodation for her schedule" related to her FMLA leave.  ECF No. 27 at 5.[2]  At the meeting, Kempton claims that Douglas complained about the FMLA time she had taken and told her that it was creating problems with other Hannaford employees.  *Id.*  She also claims that Douglas threatened to withhold his recommendation in the event that she tried to transfer to another Hannaford store located in Gardiner.  ECF No. 28 at 20, ¶ 20.

---

[2] Kempton does not cite to the summary judgment record with regard to this allegation, so it is not possible to ascertain what sort of accommodation she requested.

Following the one-on-one meeting with Douglas, Kempton called "ISHARE," Hannaford's human resources hotline, and complained that Douglas had spoken to her without a witness present.   ECF No. 27 at 19-20; ECF No. 28 at 20, ¶ 21. Kempton maintains that she believed that conducting such a meeting without a witness present was a violation of company policy and illegal.  *Id.*  Immediately after registering her complaint via ISHARE, Kempton claims, she suffered further discipline and was prevented from taking FMLA leave to care for her husband.  *Id.* Hannaford denies that Kempton suffered any retaliation because of her complaint. ECF No. 32 at 12-13, ¶ 21.

Kempton further claims that she was subject to "adverse employment actions" insofar as she received "criticism of her leaving early for FMLA issues, criticism of her interactions with other employees, criticism of her interactions with customers, changing schedules to make things difficult for [Kempton], repeatedly telling [Kempton] that nobody respected her, repeating hearsay without giving her specific examples of criticism, specifically not recommending [Kempton] for another position, making [Kempton] do work that other employees in the same position were not required to do, hyper review of [Kempton's] attendance, and refusal to allow personal time which was within the manager's discretion."  ECF No. 28 at 16, ¶ 12.

On October 8, 2012, Kempton received her Step Three final written notice at a meeting Douglas held with her, John Wellwood, and Assistant Store Manager Patti Therrien.   ECF No. 28-31; ECF No. 28 at 18, ¶ 17; ECF No. 22-13.   Douglas wrote an internal memorandum memorializing the meeting, ECF No. 28-31, which states that Kempton was being disciplined for leaving work early on October 3, 2012.   Kempton

asserts that she did not work on October 3, ECF No. 28 at 18, ¶ 17, and cites this as an example of Hannaford's retaliation for her taking FMLA leave, ECF No. 27 at 10, ¶ 11 ("Plaintiff was disciplined for leaving work on a day she didn't even work."). Hannaford explains that Douglas' reference to October 3 was a typographical error, and that she was disciplined for leaving work early on October 4, as reflected in the Step Three performance counseling form that Kempton received at the October 8 meeting.  ECF No. 32 at 19-20, ¶ 35 (citing ECF No. 22-13 (stating that Kempton "worked less than ½ her shift . . . [on] 10/04/12")).

More generally, Kempton also asserts that the Associate Resources Manager, John Wellwood, told her that the decision to take FMLA time was hers and that she simply needed to tell him when she wished to take such leave.  ECF No. 28 at 27, ¶ 47. However, according to Kempton, Ron Douglas required that she tell subordinates, such as the store "shift leader," why she had to leave early or else her absence would not be authorized.  *Id.*  Kempton asserts that this placed her in the position of violating her privacy in order to avail herself of FMLA leave.  *Id.*

Kempton's Statement of Material Facts does not address the facts surrounding her termination, other than a reference to the fact that it occurred in November 2012. *See id.* at 30, ¶ 54.  Hannaford's Statement of Material Facts asserts that the store manager, Lenny Plourde, met with Kempton on November 5, 2012, and told her that her employment was terminated in part for violations of the attendance policy but also for a breach of confidentiality, based upon Kempton allegedly having improperly spoken to an hourly employee regarding the termination of a cashier for excessive till shortages.  ECF No. 22 at 10, ¶¶ 50, 51 (citing ECF No. 22-1 at 16).  Kempton offered

qualified responses to Hannaford's statement of material facts 50 and 51, asserting that "Kempton stated that the reason for dismissal was attendance," ECF No. 28 at 9, ¶ 50 (citing ECF No. 22-1), and that "Kempton does not admit to violating company policy, yet that was one allegedly pre-textual reason given[,]" *Id.* at ¶ 51 (citing ECF No. 28 at 24, ¶ 38; ECF No. 28-23 at 12, ¶ 38).

## II. SUMMARY JUDGMENT STANDARD

### A.   Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  In making that determination, a court must view the evidence in the light most favorable to the non-moving party.  *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013).  "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citation and quotations omitted).

### B.   Local Rule 56

Local Rule 56 defines the evidence that this court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment. First, the moving party must file a statement of material facts that it claims are not in dispute, with each fact presented in a numbered paragraph and supported by a specific citation to the record.  *See* Loc. R. 56(b).

8

Second, the non-moving party must submit its own short and concise statement of material facts in which it admits, denies, or qualifies the facts alleged by the moving party, making sure to reference each numbered paragraph of the moving party's statement and to support each denial or qualification with a specific citation to the record. Loc. R. 56(c). The non-moving party may also include its own additional statement of facts that it contends are not in dispute. *Id.* These additional facts must also be presented in numbered paragraphs and be supported by a specific citation to the record. *Id.*

Third, the moving party must then submit a reply statement of material facts in which it admits, denies, or qualifies the non-moving party's additional facts, if any. Loc. R. 56(d). The reply statement must reference each numbered paragraph of the non-moving party's statement of additional facts and each denial or qualification must be supported by a specific citation to the record. *Id.*

The court may disregard any statement of fact that is not supported by a specific citation to the record, Loc. R. 56(f), and the court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2). Properly supported facts that are contained in a statement of material or additional facts are deemed admitted unless properly controverted. Loc. R. 56(f).

## III. LEGAL ANALYSIS

Kempton's complaint contains three counts: (1) interference with her FMLA rights; (2) retaliation for taking FMLA leave; and (3) whistleblower retaliation in violation of the WPA, 26 M.R.S.A. § 831 *et seq.* (2015).  ECF No. 9-3.

### A.     Count One - FMLA Interference Claim

In order to make out a prima facie case for FMLA interference, a plaintiff must show that (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer notice of her intention to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.  *Carrero–Ojeda v. Autoridad de Energía Eléctrica,* 755 F.3d 711, 722 n.8 (1st Cir. 2014).  Motive is generally irrelevant to an interference claim.  *See Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir. 1998).  "The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave."  *Id.*  "To meet his or her burden in an interference with substantive rights claim, a plaintiff need only show, by a preponderance of the evidence, entitlement to the disputed leave[.]"  *Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 331 (1st Cir. 2005).

### (1)     The Notice Requirement

Hannaford does not dispute the first four elements.  *See* ECF No. 21; ECF No. 31.  Nevertheless, Kempton focuses her interference argument on the fourth element, the notice requirement, arguing that she put Hannaford on notice that she required an extension of her approved intermittent FMLA leave beyond May 2012 when she

10

continued to take approved absences to care for her husband, as evidenced by the numerous "call-in reports" dating from as late as August 2012 to October 2012. ECF No. 27 at 16 (citing ECF No. 28-37 to ECF No. 28-44). Since Hannaford does not dispute that Kempton satisfies the FMLA notice requirement element, *see* ECF No. 31 at 1-2, I consider it satisfied for summary judgment purposes, and my focus is on the fifth element regarding whether Kempton was denied FMLA benefits to which she was entitled.[3]

### (2)    Denial of FMLA Benefits

Kempton cannot establish the fifth prima facie element, i.e., that Hannaford denied her FMLA benefits to which she was entitled. Kempton admitted multiple times during her deposition that Hannaford granted her FMLA leave whenever she needed it, including after her leave period expired in May 2012:

> Q: [I]s it fair to say that after going through your various requests in 2011 and 2012 for FMLA leave that you became familiar with the procedures of the company and what documents were necessary to be submitted?
> A: Yes.
> Q: Okay. And it is also fair to say that [Hannaford] approved your FMLA leaves in each one of those instances?
> A: Yes.

ECF No. 22-1 at 9;

---

[3] Although the notice requirement typically contemplates notice flowing from the employee to the employer, *see Carrero–Ojeda*, 755 F.3d at 722 n.8, Kempton also accuses Hannaford of failing to notify her of her right to an extension of her intermittent FMLA leave in violation of the Department of Labor regulations that accompany the FMLA, 29 C.F.R. § 825.300(b)(1). ECF No. 27 at 18-19 (quoting *Bellone v. Southwick-Tolland Reg'l Sch. Dist.,* 748 F.3d 418, 422 (1st Cir. 2014) (an employer with knowledge that an employee's leave may be for an FMLA-qualifying reason must notify the employee of the employee's FMLA eligibility within five business days)). Assuming, for the sake of argument, that Hannaford did commit a notice violation under § 825.300(b)(1), such a violation did not result in any harm to Kempton because, by her own admission, she continued to take FMLA leave "up until the time that [she] left the company." ECF No. 22-1 at 21. Thus, any presumed notice violation did not constitute FMLA interference since "[l]ate or inadequate notices . . . are not actionable unless they harm the employee." *Bellone,* 748 F.3d at 423 (citing *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 90-91 (2002)).

> Q: [I]t looks like it was John Wellwood [who] reminded you that if any of your absences or early leaves were for your husband while you are on FMLA leave for him that you need to make them aware of that right when you know that[,] so that everyone knows if you have to miss time for that reason, is that right?
> A: Yes, if I had to leave, if my husband called and I had to leave, I went to a manager and said, I have to go. It is something with my husband.

*Id.* at 14;

> Q: Okay.  And if I understand correctly, every time that you did take time off under the FMLA, the company recognized and credited you with that time off under the FMLA?
> A: Yes.

*Id.* at 19;

> Q: And if I understand correctly, between July 27 . . . up until the time that you left the company, there are numerous days off that you were allowed to take in whole or in part to care for your husband?
> A: Yes.
> Q: And those—all those days were still considered to be FMLA leave days if I understand correctly?
> A: Yes.

*Id.* at 21.

Despite her testimony, Kempton contends that Hannaford frustrated her attempts to obtain FMLA leave by (1) sending her the August 2012 FMLA letter which omitted the dates of the approved leave, and (2) refusing to assist her in entering a request for an extension of her FMLA leave on October 11, 2012.  ECF No. 27 at 16-17 (citing ECF No. 28 at 28-29, ¶¶ 51, 52).  These contentions are unpersuasive for two reasons.

First, in August 2012, after receiving an FMLA approval letter which she did not request and which omitted the pertinent dates, Kempton approached Lisa Buzzell for clarification.  ECF No. 28-23 at 4, ¶ 14; ECF No. 22-1 at 8.  Buzzell told Kempton

that she did not need to recertify or extend her FMLA leave, nor provide additional medical documentation, and stated that Kempton was "all set" into November of 2012. ECF No. 28-23 at 4-5, ¶¶ 14, 15. Buzzell was incorrect, and in fact, Kempton's approved intermittent FMLA leave had actually expired in May 2012. ECF No. 22-2 at 10. Nevertheless, there is no record evidence that Buzzell's erroneous information had any effect on Kempton's continued use of FMLA leave. Kempton testified that she was permitted to take days off in whole or in part to care for her husband, up until the time that she was terminated from Hannaford. ECF No. 22-1 at 21. This is further evidenced by the call-in reports which reflect that Kempton continued to take intermittent FMLA leave during the rest of August 2012, throughout September 2012, and into October 2012. *See* ECF No. 28-37 through ECF No. 28-44 (call-in reports dated August 15, 2012 through October 12, 2012); *see also* ECF No. 27 at 16 ("The Defendants . . . continued to mark the time that she left for her husband . . . on call in reports from May through October.").

Second, on October 11, 2012, Kempton stopped by Buzzell's office to inform her that she would not be staying to work her shift that day and asked Buzzell to "get the papers for her to extend her FMLA." ECF No. 36-34. Buzzell refused, telling Kempton that she "could not do that for her[,]" and instead gave Kempton a card containing the telephone number for Hannaford's Associate Service Center, which Kempton could call directly in order to request the necessary documents.[4] *Id.*; ECF

---

[4] At paragraph 51 of her statement of material facts, Kempton alleges that on October 11, 2012, Buzzell told her that she was "all set into November of 2012 for FMLA, and was currently under FMLA protection." ECF No. 28 at 29, ¶ 51 (citing Kempton's deposition testimony, ECF No. 22-1 at 8; Kempton's declaration, ECF No. 28-23 at 4, ¶¶ 14, 15).

No. 28 at 29, ¶ 51; ECF No. 36-36 at 3.  Kempton characterizes this interaction as Hannaford's failure to "process the paperwork," ECF No. 27 at 19, and claims that Buzzell refused "to enter information or assist [her] in continuing the FMLA[,]"  ECF No. 28-23 at 4, ¶ 14.

Kempton's assertion that she could not request an extension of her FMLA leave without Buzzell's assistance is undermined by her admission that she was familiar with the required procedures and documents for submitting an FMLA request.  ECF No. 22-1 at 9 ("Q: [I]s it fair to say that after going through your various requests in 2011 and 2012 for FMLA leave that you became familiar with the procedures of the company and what documents were necessary to be submitted?  A: Yes.").

Accordingly, Kempton has not established the fifth prima facie element of her FMLA interference claim because she has not asserted facts supported by admissible cited evidence that would allow a reasonable jury to conclude that Hannaford denied her FMLA benefits.  Hannaford's motion for Summary Judgment as to Count One of Kempton's complaint is granted.

---

However, there is no evidence to support the claim that this conversation took place in October 2012.  Rather, the record suggests that it took place in August 2012, shortly after Kempton received the "in blank" FMLA authorization letter dated August 17, 2012.  ECF No. 22-5; ECF No. 28-23 at 4, ¶ 14 (Kempton's declaration stating that "[i]n August of 2012, I received a letter granting me FMLA time, 'in blank' meaning the start and end time was not listed.  I asked Lisa Buzzell . . . about the letter, and she told me I did not need to recertify or extend the FMLA [leave][.]"); ECF No. 22-1 at 8 (Kempton's deposition testimony that she approached Buzzell and asked her about the letter "within the week" of the date of the letter.); ECF No. 28-23 at 4, at ¶ 15 (asserting that Buzzell's assurances regarding the "in blank" FMLA letter took place in August).

If Kempton's allegations were supported by the record, then her FMLA interference claim would be bolstered by the fact that on October 11, 2012, Buzzell both refused to get the papers for Kempton to extend her FMLA leave while also telling her that an extension was unnecessary.  Since the allegation is contrary to the record evidence, I disregard it.

**B.     Count Two – FMLA Retaliation**

Although the FMLA does not explicitly reference "retaliation," *see* 29 U.S.C.A. § 2601 *et seq.*, it is "universally recognized" that the FMLA prohibits retaliation against employees who take FMLA leave. *Pagán-Colón v. Walgreens of San Patricio, Inc.,* 697 F.3d 1, 8-9 (1st Cir. 2012) (citing *Colburn,* 429 F.3d at 331 & n.2).  In order to state a *prima facie* case of FMLA retaliation, a plaintiff must show that she (1) availed herself of a protected right under the FMLA; (2) was adversely affected by an employment decision; and (3) there was a causal connection between the protected conduct and the adverse employment action.  *Id.* at 9 (citing *Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc.,* 447 F.3d 105, 113-14 (1st Cir. 2006); *Colburn,* 429 F.3d at 335)).

Hannaford makes no argument with regard to the first two elements of Kempton's FMLA retaliation claim, but argues that her claim fails on the third element because she has not presented evidence of a "but-for" causal connection between her use of FMLA leave and her termination.  ECF No. 21 at 13.  Kempton, by contrast, argues that she has presented direct evidence of but-for causation by "constructing a convincing mosaic of circumstantial evidence[.]"  ECF No. 27 at 8-9 (quoting *Ridings v. Riverside Med. Ctr.,* 537 F.3d 755, 771 (7th Cir. 2008)).

FMLA retaliation claims that do not feature direct evidence are analyzed under the *McDonnell Douglas* burden-shifting framework, with the plaintiff carrying the initial burden of establishing a prima facie case.  *Colburn,* 429 F.3d at 335-36.  If the plaintiff meets this burden, then the defendant must articulate a legitimate, non-retaliatory reason for the adverse employment action.  *See Pagán-Colón,* 697 F.3d at

9 (citation and quotation omitted).  If the defendant satisfies its burden, the plaintiff retains the ultimate burden of establishing that the employer's stated reason was in fact a pretext for retaliation.  *Id.*

### (1) Causal Connection

In the retaliation claim context, a causal connection can be shown by a temporal proximity between the protected conduct and the adverse action: "temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." *DeCaire v. Mukasey,* 530 F.3d 1, 19 (1st Cir. 2008) (quoting *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff,* 511 F.3d 216, 224 (1st Cir. 2007)) (quotation marks omitted).  In *Mariani-Colón,* 511 F.3d at 224, a timespan of two months was held to be sufficiently close to establish causation.

Here, the call-in reports identified by Kempton evidence her use of FMLA leave throughout September and as late as October 2012, less than one month before her termination.  ECF No. 28-37 through ECF No. 28-44.  Thus, on the basis of temporal proximity alone, I conclude that Kempton has met the burden of establishing a causal connection between her availment of a right under the FMLA and an adverse employment action. Therefore, she has established a prima facie case of FMLA retaliation.

### 2)  Pretext

Hannaford argues that it terminated Kempton's employment due to her poor attendance and punctuality.  ECF No. 21 at 15-16.  This justification satisfies Hannaford's *McDonnell-Douglas* burden of articulating a legitimate, non-retaliatory

reason for the adverse employment action.  *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 174 (1st Cir. 2003); *Pagano v. Frank,* 983 F.2d 343, 348 (1st Cir. 1993).

The focus and burden of proof thus turn to Kempton to establish that Hannaford's reason for disciplining and terminating her for poor attendance and punctuality is a pretext and that its real reason was because she took FMLA leave. *Pagán-Colón,* 697 F.3d at 9 (quotation omitted).  Kempton may demonstrate pretext either indirectly by showing that Hannaford's stated reasons for terminating her were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason.  *Hodgens,* 144 F.3d at 168 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981)).  One way Kempton may succeed is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and with or without additional evidence and inferences properly drawn therefrom infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.*  (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997)) (quotation marks omitted).  In evaluating the sufficiency of Kempton's asserted facts to withstand summary judgment, I must consider them in combination, "not each standing alone." *Id.* at 170.

Hannaford argues that Kempton has not pointed to any evidence that her employee discipline and eventual termination were actually related to her FMLA leave.  ECF No. 21 at 15-16.  In response, Kempton argues that "a plaintiff should not be required to produce 'smoking-gun' evidence before prevailing in a

discrimination suit[,]" and that "[t]here are many veins of circumstantial evidence that may be mined by a plaintiff to this end."  ECF No. 27 at 12-13 (quoting *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 824 (1st Cir. 1991)).  She claims to have shown, if not a "smoking gun," then "at the very least, an extremely hot barrel."  *Id.* at 13.

### a) Employee Discipline

Kempton claims that she was "counseled" on August 13, 2012, not to leave work early and shortly thereafter was disciplined for taking FMLA leave on August 15, 2012, when she left work early to care for her husband.  ECF No. 27 at 13 (citing ECF No. 28 at 25, ¶ 41).  She cites a call-in report which reflects that she indeed left work early on August 15, 2012, and which contains the notation "3.05 hrs FMLA."  ECF No. 28-37.  Yet the call-in report itself makes no mention of Kempton having been disciplined as a result.  *See id.*  Furthermore, in her deposition testimony, Kempton made no mention of her FMLA leave being discussed at the August 13 counseling discussion.  *See* ECF No. 22-1 at 11-12.  Rather, Kempton testified that Ron Douglas told her that "if [she] needed to leave for an emergency, that [she] could just simply advise them and then they would make that accommodation[.]"  *Id.*

Kempton also cites a Step One performance counseling form from her personnel file dated August 21, 2012, which states that Kempton "continued to punch in early and leave early[,]" and on several occasions she left early for personal reasons and adjusted her schedule without approval, despite the fact that she was "counseled" on August 13 that she should work her scheduled hours.  ECF No. 36-50 (cited at ECF No. 28 at 25, ¶ 41).  While the performance counseling form is evidence of

employee discipline, it contains no reference to her absence on August 15, or any other FMLA-related absence. *See id.*

Finally, Kempton cites to a spreadsheet entitled "Index of EE Performance Issues," which consists of a list of anonymous employees who were disciplined between 2010 and 2015, along with the dates of discipline and the reasons given. ECF No. 36-58. The spreadsheet contains no names, and August 15, 2012, is not one of the dates listed. *See id.* The date of Kempton's memorialized Step One verbal performance counseling—August 21, 2012—is also missing from the spreadsheet. *See id.*

Considered as a whole and viewed in the light most favorable to Kempton, the record evidence of employee discipline against her that she cites does not permit a reasonable conclusion that Hannaford's stated reasons for terminating Kempton for non-FMLA absenteeism are pretextual. Kempton admitted that Ron Douglas, while counseling her on August 13, told her that she needed to check in with a manager or assistant manager when she was going to be leaving for the day, or if she needed to leave for an emergency. ECF No. 22-1 at 11. Even if one of the "several occasions" that Kempton left work early without approval was for an FMLA-related reason, such as on August 15, Kempton could not establish that Hannaford's reasons for terminating her were pretextual because the record is replete with instances in which Kempton left her shift without authorization. ECF No. 28-36 at 17, 23, 29, 30, 32, 34. An employer's need to maintain control over when and how employees come and go from the workplace is a legitimate reason for subjecting employees to workplace discipline.

19

### b) Direct Complaints Concerning FMLA Leave

Kempton also claims that she can establish pretext on the basis of Ron Douglas' "direct complaints" about her FMLA leave.  ECF No. 27 at 13; ECF No. 28 at 28, ¶ 50.  She asserts that she attended a "closed door, private meeting" with Douglas in late August 2012, where she requested "an accommodation for her schedule," and claims that Douglas responded by "complain[ing] about the FMLA time she took off and that it was creating problems with other employees."  ECF No. 27 at 5.  The sole item of record evidence supporting Kempton's allegation is her declaration.  *See id.* at 6 (citing ECF No. 28 at 28, ¶ 50 (citing ECF No. 28-23 at 8, ¶ 21)).  Her declaration is, however, inconsistent with her deposition testimony.

Kempton testified at her deposition about her request for a schedule accommodation at the late August 2012 meeting with Douglas.  ECF No. 22-1 at 12 (responding to question about a meeting with Douglas on or about August 26, 2012).  When asked how Douglas responded to her, Kempton testified only that he agreed to the schedule change and she made no mention of any complaints by Douglas or any other manager regarding her FMLA leave.  *Id.* at 12-13.

Kempton's contradictory characterizations of her meeting with Douglas are noteworthy because "[w]hen an interested witness has given clear answers to unambiguous questions, [s]he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4-5 (1st Cir. 1994).  Accordingly, I disregard Kempton's assertion,

made in her declaration, that Douglas criticized her for taking FMLA leave when she approached him about changing her schedule.

### c) The "Dismissive View" of Management

As further circumstantial evidence of pretext, Kempton points to "the dismissive view that management took when Kempton took FMLA leave[,]" ECF No. 27 at 13 (citing ECF No. 28 at 30, ¶ 53), quoting an October 8, 2012, email from John Wellwood to Linda Shute, an associate relations specialist, in which the two discussed Kempton's employee discipline for attendance and punctuality:

> "The early leaves [leading to Kempton's discipline] listed here are not tied in to the FMLA for her husband.  She has specified that reason for leaving early on some occasions.  She is well aware of the pass she gets when she claims time off for her husband."

ECF No. 28-32 at 2.

Viewing the email in the light most favorable to Kempton, a fact-finder might reasonably interpret Wellwood's use of the word "pass" as dismissive.  Yet even assuming such a characterization, Wellwood's email also contains contemporaneous statements that indicate that Kempton was being disciplined for reasons other than her intermittent FMLA leave, i.e., "[t]he early leaves listed here are not tied in to the FMLA for her husband."  *Id*.  Thus, Wellwood's email cannot reasonably be said to establish pretext.

### d) Hostility by Other Employees

Kempton cites "hostility that management allowed other employees to have when Kempton took FMLA leave" as more evidence that Hannaford's reasons for terminating her are pretextual.  ECF No. 27 at 13 (citing ECF No. 28 at 27-28, ¶¶ 48,

49).  The exhibits she cites do not support her contention.  For example, Kempton relies upon an email "between [John] Wellwood and other managers," ECF No. 28 at 27, ¶ 48 (quoting ECF No. 28-32 (the "Wellwood email")), yet because the email is between managers only, it contains no evidence of hostility by other employees.  Even if the Wellwood email were relevant, Kempton selectively quotes it.  She includes the following excerpt in her statement of material fact: "Nicole '*tells'* service leaders she is leaving early.  Early leaves are not based on business needs.  They are based on her own desire to leave early for one personal reason or another (she just says she is leaving)."  *Id.* (quoting ECF No. 28-32 at 2).  Kempton omits the following excerpt from the very same email: "The early leaves listed here are not tied in to the FMLA for her husband."  ECF No. 28-32 at 2.  Thus, in addition to conveying no information about employee attitudes toward Kempton, the Wellwood email suggests, through the omitted quote, that Wellwood's concerns about her alleged absenteeism were based on her non-FMLA absences and undercuts Kempton's reliance on it.

Kempton's other allegations concerning employee hostility also fall short of establishing pretext.  She claims that Hannaford failed to properly instruct associates and shift leaders regarding "privacy concerns" and failed to instruct subordinate employees about the "rights" of managers like Kempton to leave work early for personal reasons.  ECF No. 28 at 28, ¶ 49.  None of Kempton's cited record evidence supports either allegation.  Kempton cites notes from an October 2, 2012, meeting between Ron Douglas, herself, and other Hannaford managers at which Douglas told her that she gave the impression "that you can come and go as you please and this upsets the frontend [sic]," and that "[y]ou have created many negative waves on the

front end with your absences." ECF No. 36-45. Neither statement relates to whether Hannaford instructed its associates regarding "privacy concerns" of any kind. Additionally, the fact that Douglas referred to negative sentiment among subordinate employees with regard to Kempton's absences does not support her assertion that Hannaford owed her a duty to train lower-level employees about its leave policy for managers, and Kempton has cited no legal authority for this point. Furthermore, another Wellwood email states that "Nicole's unreliability continues to cause moral [sic] issues on the Front End as she appears to be being held to a lower standard than the other Front End Associates . . . These Absences and Tardies are not related to the FMLA she is on for her husband. These are in addition to those missed shifts and early leaves[.]" ECF No. 28-32 at 4. This statement disentangles the low morale of subordinate "front end" employees from Kempton's FMLA leave.[5]

### (e) Refusal to Assist Kempton in Continuing FMLA Leave

As further evidence of pretext, Kempton points to Hannaford's "refusal to assist in continuing FMLA leave," ECF No. 27 at 13 (citing ECF No. 28 at 28-29, ¶¶ 51, 52), and references the October 11, 2012, incident in which Kempton stopped by Buzzell's office and asked Buzzell to "get the papers for her to extend her FMLA." ECF No. 28 at 28-29, ¶ 51; ECF No. 36-34. Buzzell told Kempton that she "could not do that for her," and instead gave Kempton a card containing the telephone number

---

[5] Kempton also cites Paragraph 47 of her own Declaration (ECF No. 28-23 at 15, ¶ 47), which in turn cites the October 2, 2012, meeting notes discussed above (ECF No. 36-45). Paragraph 47 of Kempton's Declaration also contains the conclusory and unsupported allegation that other employees were jealous when they saw her leave early for shifts. ECF No. 28-23 at 15, ¶ 47. Also, Paragraph 47 cites to "Kempton Deposition Exhibit 17," which does not appear in the evidentiary record filed by Kempton. *See id.*

for Hannaford's Associate Service Center, where Kempton could call directly in order to request the necessary documents.  ECF No. 36-34; ECF No. 28 at 29, ¶ 51 ("Buzzell refused to enter the documentation, instead basically telling Kempton to do it herself by giving her a number to call.").

Kempton also cites John Wellwood's deposition testimony, which contradicts Buzzell insofar as Wellwood stated that it was his job to enter a new FMLA request for an associate electronically so that the request would be received by Hannaford's benefits department.  ECF No. 28 at 29, ¶ 52 (citing ECF No. 36-60 at 1-2).

The contradiction between (1) what Buzzell told Kempton and (2) what Wellwood testified to regarding the procedure for requesting FMLA time establishes, at most, that Buzzell was incorrect when she told Kempton that she "could not" give her the papers for an FMLA extension.   It does not evidence any retaliatory animus because, as Buzzell's contemporaneous written memorandum and her deposition testimony both indicate, she directed Kempton to Hannaford's Associate Service Center and gave her a card with the service center's telephone number on it.  ECF No. 36-34; ECF No. 36-36 at 2-3.  Kempton admits that Buzzell gave her the telephone number for the Associate Service Center, *see* ECF No. 28 at 29, ¶ 51, and is silent regarding whether the service center assisted employees with paperwork related to FMLA leave requests, *see* ECF No. 28.  Thus, Hannaford's alleged "refusal to assist in continuing FMLA leave" does not constitute circumstantial evidence of pretext.

### (f) Defendants' Emails Discussing FMLA Leave

Kempton also claims that she can show circumstantial evidence of pretext by reference to the "personal emails" of Hannaford's managers.  ECF No. 27 at 13 (citing

ECF No. 28 at 17-18, ¶¶ 15, 15A, 15B).  She asserts that the emails show that the managers discovered after the fact that her intermittent FMLA leave had expired in May 2012, and then fired her for the FMLA absences she took after May that were related to her husband's illness.[6]

The emails between Wellwood and other Hannaford managers reflect a mounting impatience with Kempton's absences and early departures from work, as well as confusion about when her approved intermittent FMLA leave ended.  *See* ECF No. 28-32; ECF No. 28-55.  However, the emails Kempton points to also explicitly state that the absences and early departures at issue were not related to her intermittent FMLA leave.  ECF No. 28-55 at 4 ("These Absences and Tardies are not related to the FMLA she is on for her husband."); ECF No. 28-32 at 2 ("The early leaves listed here are not tied in to the FMLA for her husband."); *id.* at 5 ("The only absences we have dealt with so far are for reasons other than FMLA.").

One of the cited emails, sent from John Wellwood to Linda Shute on October 12, 2012, might have supported Kempton's allegation that once Hannaford discovered that her intermittent FMLA leave had possibly expired, it used that to fire her for absences related to her husband's illness.  ECF No. 28-55 at 5 ("So . . . do we deal

---

[6] Local Rule 56 details the process by which the parties present the facts to be considered in deciding a motion for summary judgment.  Pursuant to this local rule, the nonmoving party is required to submit with its opposition a "separate, short, and concise" statement of material facts that it contends are not in dispute, each supported by a specific record citation.  Loc. R. 56(c).  Kempton's statement of material fact number 15 (ECF No. 28 at 17-18, ¶¶ 15, 15A, 15B), is one of several of Kempton's statements of material fact which are neither short nor concise, and which contain several distinct facts organized into an argumentative narrative.  *See* ECF No. 28.  Furthermore, two factual assertions in statement of material fact number 15 do not contain citations to the record.

Despite the fact that many of her statements of material facts do not fully satisfy Local Rule 56(c)'s requirements, I have closely reviewed and considered all of Kempton's factual allegations and have given every favorable inference she is due as the nonmovant at summary judgment.

with her absences this week as regular absences, give her a Step 4 and term her?"). However, this email demonstrates that these managers were assessing her absences, not that they had concluded that the absences were FMLA-related. Moreover, Kempton cites the email in isolation from subsequent emails, because the email between Wellwood and Shute also states that they should "wait to see what" Diane Waterhouse, a benefits administrator, had to say about whether Kempton had remaining FMLA leave. ECF No. 28-32 at 5. Thus, whatever weight the October 12 email might have had as evidence of pretext is significantly diminished. Additional subsequent emails between Wellwood and other Hannaford managers bolster this conclusion because they evidence the managers' attempts to comply with their obligations under the FMLA. ECF No. 28-32 at 1-2 ("If she was under a doctor's care . . . that might be FMLA[.]") ("I would let her know where she stands with absences and ask her if she needs any accommodations to avoid any further violations.") ("I would explain to her if she feels any absences are FMLA, she can contact the ASC to initiate an FMLA."); ECF No. 28-55 at 3 ("Can you tell me if she is communicating with anyone the need to leave early and if so, what are the reasons? Are they FMLA protected?").

Kempton also cites an unsigned, handwritten note, dated October 12, 2012, that was added to her personnel file by an unknown person or persons, stating that she was "not protected by FMLA" and that "any further absences will result in termination." ECF No. 28 at 18, ¶ 15B (citing ECF No. 28-27). Yet Kempton omitted the fact that the note added, "Does she need any further accommodation other than what Ron has already given [her]," which evidences an attempt to comply with FMLA

obligations and undercuts Kempton's argument that Hannaford managers sought to terminate her for absences related to her husband's illness once they discovered that her intermittent FMLA leave had expired. Kempton's argument is further contradicted by an October 17, 2012, email between Wellwood and Linda Shute which observed that Kempton's intermittent FMLA leave ended in May 2012, but that Hannaford did not count absences relating to her husband as contributing to her employee discipline. ECF No. 28-32 at 5-6 ("Did we count absences after 5/6/12 relating to her husband that resulted in a step? No. The only absences we have dealt with so far are for reasons other than FMLA.").

Despite the correspondence discussed above, Kempton avers that she "was not made aware" that her intermittent FMLA leave had expired and that she "missed work for her husband several times since that point, ultimately being fired." ECF No. 28 at 18, ¶ 15B (citing ECF No. 28-29). Kempton cites a handwritten October 13, 2012, note written by a fellow employee that states that after receiving a telephone call from her husband, Kempton evinced a need to speak to a person named Judy about leaving early. ECF No. 28-29. I find for summary judgment purposes that Kempton in fact left work early on October 13, 2012, in order to care for her husband. Nevertheless, whatever weight this note lends to Kempton's pretext argument is undercut by the October 17, 2012, email between Wellwood and Linda Shute stating that Hannaford did not count absences relating to her husband as contributing to her employee discipline. ECF No. 28-32 at 5-6.

### g) Inconsistent Application of the Attendance and Punctuality Policy

Kempton also alleges that she can establish pretext on the basis that Hannaford's attendance and punctuality policy was inconsistently applied, and that she was the only employee who received a written warning after four alleged violations and was the only employee who was disciplined for arriving early for her shift.  ECF No. 27 at 13-14 (citing ECF No. 28 at 22, ¶ 31; ECF No. 28 at 24-25, ¶¶ 40, 41).  This argument fails for several reasons.

First, Kempton's assertion that she received a written warning after her fourth absence is misleading because it implies that she was formally disciplined after four absences.  Instead, she received a written notice after her fourth absence noting that she had called in sick on four occasions and that any further absences prior to March 7, 2013, would result in "Step Counseling" under Hannaford's attendance policy.  ECF No. 22 at 7, ¶ 35 (citing ECF No. 22-7).  Kempton does not dispute that she received the notice, and does not assert in her statement of material facts that the notice was a form of written discipline.  ECF No. 28 at 6, ¶ 35.

Second, Kempton admits that she received Step One performance counseling upon her fifth absence.  ECF No. 28 at 23, ¶ 33.  She contends, however, that the fifth absence was FMLA-related because she left early to care for her husband.  ECF No. 28-23 at 11, ¶ 33 (citing ECF No. 36-30).  Yet this contention is undermined by the fact that Kempton did not dispute Hannaford's statement of material fact asserting that the occurrences that formed the basis of discipline imposed on her were exclusively for her own illness.  ECF No. 28 at 12, ¶ 64.

28

Kempton's assertion that she was the only employee disciplined upon her fifth absence also is not supported by the record. Hannaford has introduced evidence of at least one other employee who received Step One performance counseling upon their fifth absence. ECF No. 22-25 at 3; *see Fong v. American Airlines, Inc.,* 626 F.2d 759, 762 (9th Cir. 1980) (no inference of discrimination where plaintiff was in a category where other employees were disciplined for similar behavior).

### h) Conclusion

Viewing the disputed and undisputed facts in the light most favorable to Kempton, she has not met her burden to show that Hannaford's proffered legitimate reasons for terminating her were actually a "sham intended to cover up [its] real motive." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 9 (1st Cir. 1990). Kempton failed to dispute Hannaford's statement of material fact that "[t]he occurrences which were used as the basis of discipline that was imposed on Ms. Kempton were all associated with her own personal sickness." ECF No. 22 at 12, ¶ 64; *see also* ECF No. 28 at 12, ¶ 64. Hannaford's statement of material fact number 64 is supported by Kempton's deposition testimony:

> Q:   And if I understand correctly, between July 27 . . . up until the time that you left the company, there are numerous days off that you were allowed to take in whole or in part to care for your husband?
> A:   Yes.
> Q:   And . . . all those days were still considered to be FMLA days if I understand correctly?
> A:   Yes.
> Q:   And the days . . . which were the basis of the discipline . . . were all days associated with your own personal sickness?
> A:   Yes.

ECF No. 22-1 at 21.  Although an employee "may not be penalized for exercising her rights under the [FMLA], an employee may nevertheless be discharged . . . for independent reasons during or after her taking of FMLA leave." *Carrero-Ojeda,* 755 F.3d at 719.

Furthermore, the issue in assessing pretext in a *McDonnell Douglas* burden-shifting case is not whether the reason for firing the plaintiff was real, but rather, whether the defendant *believed* it was real.  *Smith v. Heritage Salmon, Inc.,* 180 F. Supp. 2d 208, 218 (D. Me. 2002) (citing *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 7 (1st Cir. 2000); *Mulero-Rodríguez v. Ponte, Inc.,* 98 F.3d 670, 674 (1st Cir. 1996)).  Kempton, herself, expressed uncertainty as to whether FMLA retaliation was the real reason for her termination, because she agreed in her deposition testimony that the days that were the basis of her employee discipline were all days associated with her own personal sickness, as opposed to FMLA leave to care for her husband.  ECF No. 22-1 at 21.

Accordingly, I conclude that Kempton has not met her burden of establishing that her managers believed her FMLA leave to be the real reason for her termination, particularly in light of direct evidence of her non-FMLA absenteeism and her admissions at deposition.  Consequently, Hannaford's motion for summary judgment as to Count Two of Kempton's complaint is granted.

## C.   Count Three - Whistleblower Retaliation

Kempton contends that Ron Douglas retaliated against her after she complained to the Hannaford ISHARE network immediately after attending a "closed[-]door, private meeting" with him in "late August, 2012."  ECF No. 27 at 5-6.

30

Kempton claims that she believed such a private, closed door meeting to be a violation of company policy, ECF No. 28 at 28, ¶ 50, and illegal, ECF No. 28-23 at 8, ¶ 21.  She asserts that the retaliation consisted of Douglas becoming "even more critical" of her attendance and refusing to approve additional time off.  *Id.*

> The WPA states that:
>
> No employer may discharge, threaten or otherwise discriminate against an employee . . . because . . . [t]he employee, acting in good faith . . . reports orally or in writing to the employer . . . what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State[.]

26 M.R.S.A. § 833(1) (A) (2015).  To prevail on an MHRA claim for whistleblower discrimination, Kempton must show that (1) she engaged in activity protected by the WPA; (2) she experienced an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse action. *Fuhrmann v. Staples Office Superstore East, Inc.,* 2012 ME 135, ¶ 15, 58 A.3d 1083 (citing *Currie v. Indus. Sec., Inc.,* 2007 ME 12, ¶ 12, 915 A.2d 400).

The Maine Law Court recently dispensed with applying the familiar *McDonnell Douglas* burden-shifting framework to the summary judgment stage of WPA retaliation cases. *Brady v. Cumberland Cty.,* 2015 ME 143, ¶ 39, 126 A.3d 1145; *Cormier v. Genesis Healthcare LLC,* 2015 ME 161, ¶ 8 n.2, 129 A.3d 944.  Under the new approach prescribed by *Brady,* the employee must still produce evidence generating a triable issue on each of the prima facie elements of a WPA retaliation claim. *Brady,* 2015 ME 143, ¶ 39, 126 A.3d 1145.  If the court determines that the evidence in the summary judgment record would allow a jury to find for the employee

on each prima facie element of her case, then summary judgment for the employer should be denied. *Id.*

### 1) Protected Activity

Although Kempton cites no legal authority whatsoever in her argument regarding whistleblower retaliation, *see* ECF No. 27 at 19-21, she nevertheless argues that her ISHARE complaint was protected activity under the WPA because she had a "good-faith, objective belief that meeting alone with her was illegal[.]" *Id.* at 20; *see also* ECF No. 28-23 at 8, ¶ 21 ("I was told that there was no policy against meeting with me alone, something I thought illegal.").

Hannaford, on the other hand, argues that "no reasonable person would have believed" that a supervisor meeting alone with a subordinate was a violation of law, ECF No. 21 at 18, and cites *Galouch v. Dep't of Prof'l & Fin. Reg.,* 2015 ME 44, ¶¶ 14-15, 114 A.3d 988, for the proposition that an employee's subjective belief alone is insufficient to meet the WPA's reasonable cause requirement. ECF No. 21 at 17-18.

To establish that an employee has engaged in protected activity, the WPA requires, first, that "an employee . . . prove that a reasonable person might have believed that the employer was acting unlawfully[,]" and, secondly, it requires evidence that the employee subjectively believed that the employer violated a law or rule. *Bard v. Bath Iron Works Corp.,* 590 A.2d 152, 154-55 (Me. 1991); *see also Stewart-Dore v. Webber Hosp. Ass'n,* 2011 ME 26, ¶ 11, 13 A.3d 773 ("The reasonable cause requirement is met only when the employee presents evidence showing that . . . the belief was objectively reasonable in that 'a reasonable person might have believed that'" a dangerous condition existed.") (discussing 26 M.R.S.A. § 833(1)(B)).

Kempton has satisfied the second half of this requirement by offering her declaration as evidence of her subjective belief that the private meeting between her and Douglas was illegal.  ECF No. 28-23 at 8, ¶ 21.  However, she has not argued that her belief was reasonable, nor cited any evidence tending to prove that a reasonable person would believe that Douglas was acting unlawfully by meeting with her alone.  *See* ECF No. 27; ECF No. 28.  Instead, Kempton offers conclusory assertions—again, with no citation to legal authority—to the effect that her "belief that the private meeting was the illegality in question shows good faith," and that "[a] mistaken good faith belief that something is illegal is trumped by an actual, objective, illegal action such as FMLA interference or retaliation."  ECF No. 27 at 20.  At one point, Kempton actually undermines her reasonableness argument by admitting that "the context of the conversations was the real issue . . . not the fact that they were done in private[.]"  *Id.* at 21.

Kempton's admission that the private nature of the meetings was not "the real issue," *id.* at 21, combined with her failure to cite either legal authority or evidence in support of her reasonableness argument, and her conclusory circumlocutions on the same, are all fatal to her ability to establish the first prima facie element of her WPA claim—that her ISHARE report constituted protected activity under the WPA.

**2) Causal Connection**

Even if Kempton could establish that her ISHARE report was protected activity, she did not allege or address the causal connection element of her WPA claim.  *See* ECF No. 27 (Opposition to Summary Judgment); ECF No. 3-2 at 4 (Count III of the Complaint); ECF No. 28 (Kempton's Statement of Material Facts).  Despite

this omission, I consider the central question of whether the summary judgment record contains evidence that would allow a jury to reasonably find that Douglas disciplined or terminated Kempton as retaliation for her ISHARE report. *See Cormier,* 2015 ME 161, ¶ 18, 129 A.3d 944.

There is no direct evidence that Douglas was aware of Kempton's ISHARE report, nor does Kempton explicitly allege that he was—she simply stated in her declaration that Douglas was even more critical of her attendance after she made the report, and that he would no longer approve any time off or allow her to leave early. ECF No. 28-23 at 8, ¶ 21.  The latter allegation—that Douglas refused to approve additional leave or allow Kempton to leave early after her ISHARE report—is contradicted by Kempton's deposition testimony, in which she testified that she was permitted to take FMLA leave "up until the time that [she] left the company[.]"  ECF No. 22-1 at 21.  It is also contradicted by numerous call-in reports, dated September 17, 2012, through October 12, 2012, which reflect that Kempton took multiple days off after making the late August ISHARE report, both for FMLA leave and for other reasons.  ECF No. 28-38 through ECF No. 28-44.

Kempton also alleges that she was disciplined with a "Step 3" performance counseling for leaving early on October 3, despite evidence that she was not scheduled to work that day.  ECF No. 27 at 20 (citing ECF No. 28 at 18, ¶ 17 (citing ECF No. 28-23 at 6, ¶ 17 (citing ECF No. 28-31; ECF No. 28-33))).  Viewing this statement in the light most favorable to Kempton, it could be interpreted to mean that she suffered an adverse employment action within approximately one month to six weeks of her ISHARE report, which by her own account took place "immediately" after the late-

August 2012 meeting.  ECF No. 27 at 5; *see Daniels v. Narraguagus Bay Health Care Facility,* 2012 ME 80, ¶ 21, 45 A.3d 722. ("Temporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case.").   However, the performance counseling form that documents Kempton's Step Three counseling indicates that she was actually disciplined for leaving early on October 4, a day on which she does not deny that she left early.  ECF No. 22-13 (performance counseling form stating that Kempton "worked less than ½ her shift . . . [on] 10/04/12[.]").  This constitutes a "clear, specific reason[]" for the adverse employment action taken against Kempton that has nothing to do with retaliation against her for protected conduct, and it provides legitimate justification for disciplinary action "untainted by retaliatory animus." *Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 26 (1st Cir. 2004).

I conclude that the evidence in the summary judgment record would not allow a reasonable jury to find for Kempton on either the protected activity or the causal connection elements of her WPA claim.  *See Brady,* 2015 ME 143, ¶ 39, 126 A.3d 1145. Accordingly, summary judgment for Hannaford on Count Three is granted.

## IV. CONCLUSION

For the foregoing reasons, Hannaford's Motion for Summary Judgment (ECF No. 21) is **GRANTED.**  Kempton's complaint (ECF No. 9-3) is **DISMISSED.**

**SO ORDERED.**

**Dated this 17th day of March, 2016.**

/s/ Jon D. Levy
**U.S. DISTRICT JUDGE**